## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| **Kate Parney**, | Civil Action |
| Plaintiff, | No. 2:25-cv-_____ |
| **vs.** | **COMPLAINT** |
| **Alma College**, | **(Violations of Title VII, Title IX, Michigan Law, and Constitutional Rights Including Claims of Unlawful Segregation)** |
| Defendant. | **Jury Trial Requested** |

**COMES NOW** the Plaintiff, Kate Parney, by and through her attorneys, and for her causes of action, hereby states the following:

### INTRODUCTION AND SUMMARY OF CLAIMS

1.      Plaintiff Kate Parney ("Coach Parney" or "Plaintiff") brings this action against Alma College ("AC" or "Defendant") for gender discrimination resulting in a hostile work environment, wrongful termination, and long-term damage to her college coaching career, in violation of her rights under state and federal law. Coach Parney also alleges retaliation through AC's refusal to conduct an effective investigation despite known risks that gender stereotypes and socialization were influencing the information used to justify her suspension and termination.

2.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq., applicable Michigan state law, and 42 U.S.C. § 1983 for violations of constitutional rights.

3.      This case arises from Alma College's decision to terminate Coach Kate Parney, a highly qualified and committed head coach, because she failed to conform to stereotypical

1

expectations for women in authority. In her two years leading Alma's women's soccer program, Coach Parney improved team performance, engaged in robust recruiting, fostered leadership development, and actively contributed to the College's diversity and inclusion efforts. Yet when her athletes expressed discomfort with her coaching demeanor, expecting her to simultaneously embody both authoritative and nurturing traits in a way no male coach would be asked to, Alma responded not by investigating the role of gender bias in those complaints, but by terminating her employment. This lawsuit seeks to hold the College accountable for sex discrimination, gender stereotyping, and unlawful segregation in violation of Title VII, Title IX, and Michigan law.

4.      Alma College's actions did not occur in a vacuum. The field of college athletics remains one of the most stubbornly segregated and stereotype-driven sectors in higher education. Female head coaches are systemically excluded from coaching men and remain a shrinking minority even in coaching women. This segregation reinforces two forms of gender stereotypes that critically shaped Parney's termination: *descriptive stereotypes*, which presume women are inherently more emotional, less authoritative, and less suited to leadership; and *prescriptive stereotypes*, which punish women who defy those assumptions. The complaints lodged against Parney, and the College's one-sided reliance on them, cannot be understood apart from this structural context.

5.      Courts recognize that a plaintiff may prove sex discrimination through a "convincing mosaic" of circumstantial evidence—including differential treatment, deviation from policies, and the application of gendered double standards. Here, that mosaic is vivid. Male coaches at Alma engaged in identical or more aggressive methods without consequence. Parney, by contrast, was investigated, placed on a performance improvement plan, and ultimately

terminated after a single year of improved performance, all without a single specific allegation of misconduct ever being substantiated. The administration justified her firing using vague terms like "visibility" and "team trauma," while failing to disclose the nature or source of the complaints.

6.     This lawsuit challenges not only the individual acts of discrimination against Coach Parney, but the institutional structures that sustain and conceal them. Alma College allowed biased perceptions to guide its employment decisions, relied on sex stereotypes to evaluate female leadership, and failed to apply any meaningful scrutiny to its disparate treatment of women. These practices harm not just Parney, but every woman forced to navigate a system that demands she be both "strong enough to lead" and "soft enough to nurture"—and punishes her for failing to be both at once.

7.     The gender-based scrutiny Coach Parney faced is not anecdotal or speculative. It is well-documented in the empirical literature on coaching and gender bias. Decades of research confirm that female coaches are evaluated differently than male coaches, particularly when exhibiting assertiveness or directive leadership. Female athletes are socialized to expect warmth and encouragement from female leaders, while accepting critical or forceful coaching from men as standard. When a woman adopts the same approach as her male colleagues, she is more likely to be viewed as harsh, unprofessional, or emotionally unsafe. The disparity in perception is not about the substance of coaching decisions but about who is making them.

8.     This dynamic creates a self-reinforcing structure of exclusion. Male coaches, shielded from these expectations, are less likely to be complained about for assertive behavior. As a result, when female coaches face consequences for such complaints, they are often unable to identify a male comparator with an identical complaint history—not because discrimination is

absent, but because it operates upstream by filtering who gets scrutinized in the first place. Requiring strict comparator evidence in this context rewards bias and punishes the women subject to it. The absence of a male coach who was accused of being "too intense" is not evidence of fair treatment, but a reflection of how gendered assumptions silence those critiques when applied to men.

9.     Alma's failure to account for these structural realities is not merely unfortunate, it is unlawful. Courts have long recognized that employment decisions based on stereotypes about how women should behave violate Title VII. As the Supreme Court explained in *Price Waterhouse v. Hopkins*, an employer who penalizes a woman for failing to conform to gendered expectations has acted "because of sex." 490 U.S. 228. Coach Parney was placed in an impossible position: she could either lead assertively and risk being labeled abrasive, or lead gently and risk being deemed ineffective. When Alma terminated her under the guise of team culture and emotional safety, without ever articulating a policy violation or offering her a meaningful chance to respond, it codified this impossible standard into an adverse employment action.

10.     The allegations against Parney were never investigated, documented, or subjected to basic procedural safeguards. The College refused to share the contents of the complaints, denied her access to its substance during the improvement plan process, and ultimately moved to terminate her even after she met all stated performance goals. This departure from policy and process—especially when contrasted with the deferential treatment given to male coaches at the College—further supports the inference of discriminatory intent. The decision-makers accepted unsupported accusations as fact, applied no analytical framework, and reached a predetermined outcome based on a pattern of gendered interpretation rather than objective review.

11.     This case is about more than a single coach's dismissal. It is about a system in which female coaches are evaluated through a distorted lens, one that treats leadership as a male trait and punishes women for exercising it. The law prohibits such bias not just in hiring and firing, but in the subtle, often invisible ways that institutional culture and unchecked perceptions can dictate outcomes. Coach Parney's experience exemplifies this dynamic. Through this action, she seeks not only redress for the harm done to her, but meaningful change to ensure that women in coaching are judged by their performance, not by whether they conform to outdated expectations about how women should lead.

## JURISDICTION AND VENUE

12.     This action is brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and, where applicable, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., to remedy unlawful sex discrimination, including discrimination based on gender stereotyping, retaliation, and sex-based occupational segregation.

13.     Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this case involves federal questions arising under Title VII and Title IX. The Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred within this district and because Defendant Alma College resides and conducts business within this district.

## PROCEDURAL HISTORY

15.     Plaintiff Kate Parney timely filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (EEOC), Charge No. 471-2025-03312, on March 4, 2024, alleging sex discrimination and retaliation in violation of Title VII.

16.     On April 10, 2025, the EEOC issued a Notice of Right to Sue. This action is filed within 90 days of Plaintiff's receipt of that notice, and all administrative prerequisites to the filing of this action have been satisfied.

17.     Plaintiff also submitted internal complaints of discrimination and retaliation to Alma College, placing the institution on notice of the unlawful conduct described in this Complaint.

## **FACTUAL BACKGROUND**

18.     Coach Parney was hired by Alma College on July 1, 2022 to lead its women's soccer program.

19.     In her first season, Coach Parney served as the sole coach, choosing to forgo the hiring of an assistant coach in July so as to avoid a rushed onboarding process, given that the season was to begin in July.

20.     Despite the challenge of coaching alone, Coach Parney was able to cultivate a team culture that led to a conference First-Team selection and several conference victories.

21.     Heading into her second season, Coach Parney recognized the challenges posed by the timing of her hire and the impact those challenges would have on recruiting.

22.     Throughout a highly competitive season, Coach Parney focused on building leadership, incorporating dedicated leadership days during the spring of 2023.

23.     Despite the challenges they faced, the team made significant improvements, both in terms of culture and on-field success.

24.     Over the course of her first two seasons, Coach Parney improved the team's competitiveness, recruited promising new talent, and met the measurable goals set by the College.

25.     On November 20, 2023, Athletic Director Sarah Dehring contacted Coach Parney by email regarding a concern raised by a parent. Prior to that, Coach Parney had met with Dehring and her direct supervisor, Kiana Verdugo-Maday, to discuss areas including communication with athletes, availability, and recruiting engagement. During those discussions, she was informed that her progress in these areas would continue to be evaluated.

26.     Following the email, Coach Parney was called into a meeting with Dehring and Verdugo-Maday and was placed on a Performance Improvement Plan ("PIP") for the remainder of the academic year. The PIP identified no misconduct, policy violations, or specific incidents, and instead included vague expectations related to "communication" and "team relationships." The plan required monthly meetings with Verdugo-Maday and occasional participation by Dehring.

27.     Coach Parney fulfilled every term of the PIP. In the spring and summer of 2024, she led structured leadership development meetings with student-athletes, implemented accountability groups within the team, and actively participated in campus events, including "Becoming a Scot" days for incoming students. Her annual evaluation, conducted by Verdugo-Maday on June 4, 2024, documented improvement in all assessed areas.

28.     Around August of 2024, in advance of the season, Coach Parney maintained daily engagement with the team and conducted individual meetings with each player to discuss academic progress, performance, and readiness.

29.     Despite these documented successes, Coach Parney was terminated on September 9, 2024.

30.     Coach Parney's termination cannot be understood apart from the broader pattern of sex-based segregation and stereotyping that pervades collegiate coaching. Across the country,

women remain underrepresented in head coaching roles, even in women's sports. This underrepresentation is not due to a lack of interest or ability, but rather to structural and social barriers rooted in persistent stereotypes about gender and leadership. Female coaches are subject to heightened scrutiny, are more likely to be labeled as "too intense" or "not approachable," and are often evaluated based on perceived personality traits rather than performance outcomes. *See* Rachel Madsen, *"Dads Play Basketball, Moms Go Shopping!" Social Role Theory and the Preference for Male Coaches*, 10 JOURNAL OF CONTEMPORARY ATHLETICS 277, 283 (2016).

31.    These stereotypes operate through both descriptive and prescriptive channels. Descriptive stereotypes assume that women are naturally more nurturing, less assertive, and less authoritative than men. Prescriptive stereotypes punish women for violating those assumptions—labeling them aggressive, cold, or unlikable when they exhibit traits that are viewed as acceptable or even expected in male leaders. *See, e.g.,* Lindsay Darvin et al., *Are Men Better Leaders? An Investigation of Head Coaches' Gender and Individual Players' Performance in Amateur and Professional Women's Basketball*, 78 SEX ROLES 455, 457–58 (2017).

32.    These gendered perceptions are not innate. They are the product of gender socialization, a process by which individuals learn, from an early age, the roles, behaviors, and expectations associated with their assigned gender. For women, this socialization emphasizes warmth, approachability, and emotional sensitivity. For men, it emphasizes assertiveness, independence, and control. As a result, female authority figures who act in accordance with traditionally male-coded traits (such as decisiveness or directness) are often perceived as violating social norms, even when their behavior is identical to that of a male colleague. These perceptions are not conscious choices, but learned biases embedded through years of cultural reinforcement.

33.     In the athletic context, these effects are particularly pronounced. Female athletes, like their male peers, are immersed in sporting environments that overwhelmingly associate coaching and leadership with masculinity. The vast majority of their early athletic experiences are shaped by male coaches. When a woman steps into that same role and employs the same coaching style, it can trigger dissonance between expectation and reality. That dissonance often manifests as discomfort, not because the coach's behavior is objectively harmful, but because it challenges internalized assumptions about who a coach is supposed to be. Institutions that fail to recognize this dynamic—and that respond to student discomfort without interrogating its source—risk acting as vehicles for discrimination.

34.     This dynamic played out in full during Coach Parney's tenure. In the weeks leading up to her termination, vague and subjective complaints were raised about her leadership style—none of which alleged misconduct or policy violations. Rather than addressing specific behavior, these concerns reflected conflicting expectations grounded in gender stereotypes: Coach Parney was expected to be both nurturing and authoritative, emotionally available yet professionally detached. When she maintained high standards and direct communication, her leadership was misinterpreted as emotionally harmful, even though male coaches at the College employed similar approaches without criticism.

35.     Title VII prohibits employers from making decisions based on sex-based stereotypes or from applying different evaluative standards to men and women. *See generally Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

36.     Yet the very feedback used to justify Alma's adverse action against Coach Parney—vague references to "visibility," "communication," "recruiting," and "team trauma"—

closely mirrors the kinds of generalized concerns that have been empirically linked to gender bias in evaluations of female coaches. No specific incident or performance failure was cited.

37.     By accepting these unsubstantiated and subjective perceptions without inquiry or corroboration, Alma not only failed to mitigate gender bias but allowed it to dictate its employment decision.

38.     At the time she was hired on July 1, 2022, Coach Parney inherited a program that had endured instability and underperformance. Choosing not to rush the hiring of an assistant coach just weeks before the season, she led the team as its sole coach and nonetheless fostered a culture of resilience and growth, earning multiple conference victories and an MIAA First-Team selection. Her efforts laid the foundation for a comprehensive program development strategy.

39.     These are standard responsibilities of any head coach. Yet for Coach Parney, exercising those duties placed her at risk of being labeled abrasive or emotionally harmful—labels rarely applied to similarly situated male coaches.

40.     Research confirms that women in coaching are more likely to be critiqued on vague emotional or interpersonal grounds, especially when they hold players accountable or assert authority. *See generally* R. Vivian Acosta and Linda J. Carpenter, *Women in Intercollegiate Sport*, ACOSTACARPENTER, (2014) (available at http://www.acostacarpenter.org/2014%20Status%20of%20Women%20in%20Intercollegiate%20Sport%20-37%20Year%20Update%20-%201977-2014%20.pdf) (last accessed July 1, 2025).

41.     In response to vague and largely subjective concerns raised by athletes and parents in November 2023, Alma placed Coach Parney on a PIP. The PIP did not cite any misconduct, policy violation, or identifiable conduct, and instead instructed her to improve broad interpersonal traits such as "communication" and "team relationships." These terms, especially

when applied to women, are known to be highly susceptible to gendered interpretation. Alma never offered any evidence of a policy violation or any gross misconduct.

42.     Although Coach Parney made every effort to address the vague expectations outlined in the PIP, she was terminated shortly after the start of the Fall 2024 season.

43.     Coach Parney's final day of employment was September 9, 2024. In terminating her employment, the College cited no policy violations and provided no performance-based explanation for its decision.

44.     This lack of transparency violated basic procedural norms and reflected a willingness by the College to accept gendered perceptions at face value. The administration's deference to student discomfort (absent factual investigation or corroboration) further demonstrates how subjective reactions shaped by stereotype can become the basis for adverse action when applied to female leaders.

45.     On September 9, 2024, just weeks after preseason began, Coach Parney was called into a meeting and informed that the College was "going in a different direction." No specific incident or performance failure was cited.

46.     When she asked for clarification, vague references were made to "visibility" and "team trauma." Yet administrators acknowledged that she had been present every day of the season.

47.     In the lead-up to her termination, Coach Parney received no formal discipline, no allegations of misconduct, and no warning that her job was in jeopardy beyond the vague and shifting expectations embedded in the PIP.

48.     After notifying her assistant coach and the team of her termination, Coach Parney requested a follow-up meeting with Dehring and Verdugo-Maday. During that meeting, Dehring

11

stated that the team had experienced "trauma" over the prior two weeks and that the administration had received several complaints, though she declined to identify any individuals or provide details.

49.    Dehring also stated that she had been "defending" Coach Parney and, in hindsight, should have removed her in the spring.

50.    Meanwhile, male coaches at the institution were afforded clearer standards, more generous interpretations of athlete concerns, and greater opportunities to course-correct. Complaints against male coaches were either dismissed as part of the job or treated as isolated, coachable moments. For Coach Parney, however, complaints were treated as presumptively valid and indicative of unfitness for the role. This differential treatment is not only unfair, it is unlawful under Title VII, which prohibits disparate application of discipline and adverse employment actions based on sex.

51.    The decision to remove Coach Parney from her position as of September 9, 2024, was not the result of poor performance, unprofessional conduct, or any legitimate institutional interest. It was the culmination of a pattern in which her gender shaped how her leadership was perceived, how complaints against her were processed, and how institutional actors evaluated her continued role. Despite documented improvement, positive athlete support, and full compliance with directives, she was terminated without cause, investigation, or explanation grounded in objective performance criteria. In light of the College's failure to treat similarly situated male colleagues in the same manner, the only reasonable conclusion is that Coach Parney was penalized not for what she did, but for who she was.

52.     The circumstances surrounding Coach Parney's dismissal are not unique. Female coaches across the country report being held to conflicting expectations and punished for behaviors considered normal or even commendable in men.

53.     At Alma, these patterns are reflected in the broader structure of the athletic department. Men hold a disproportionate number of head coaching roles, including in women's sports, and female coaches are consistently underrepresented in decision-making positions.

54.     That disparity is not the product of coincidence or qualification. Rather, it is the predictable result of an environment that treats male leadership as the default and female leadership as provisional.

55.     The College's reliance on unsubstantiated, gendered complaints was especially egregious given its failure to account for how gender stereotypes distort perceptions of coaching behavior. While it may appear difficult to identify direct comparators in cases involving sex-based stereotyping, that difficulty is itself a product of the bias at issue. Female coaches are more likely to be complained about for the same behaviors that go unnoticed or are accepted when exhibited by male coaches.

56.     Likewise, male athletes, parents, and administrators are less likely to perceive male coaches' conduct as problematic, and male coaches working with male athletes are often shielded from the kinds of emotional and interpersonal scrutiny directed at women. The fact that fewer complaints may be filed against male coaches does not indicate that they behave differently—it reflects how gender shapes the likelihood, content, and credibility of those complaints.

57.    When a female coach is penalized based on vague or subjective feedback, while male coaches engaging in similar behavior are not subject to equivalent scrutiny or consequence, the disparity cannot be reconciled with neutral enforcement of institutional standards.

58.    Nor was there any legitimate institutional interest served by the decision to terminate her. Coach Parney's continued leadership posed no legal, reputational, or operational risk to the College. She showed improvement, her compliance with directives was documented, and her relationships with many players and staff remained constructive.

59.    The administration's justification for her removal rested entirely on generalized impressions of discomfort and emotional response. Factors that, when examined in light of her gender, plainly indicate unlawful stereotyping and discriminatory intent.

60.    The College's disregard for the discriminatory implications of its conduct reflects a broader institutional failure to recognize how structural bias operates. By treating perceptions as reality—particularly perceptions shaped by gendered expectations—it allowed discriminatory attitudes to dictate personnel decisions. Title VII prohibits employers from acting on the basis of such stereotypes, even when they are sincerely held by others. The law does not permit an employer to insulate itself from liability by outsourcing bias to employees or cloaking it in subjective justifications.

61.    The message sent by Alma College through its treatment of Coach Parney is unmistakable: that women in coaching must navigate a narrower and less forgiving path, one where compliance with expectations is never enough if those expectations are filtered through a gendered lens. That message is not only harmful to the individual—it is antithetical to the goals of equal opportunity and fairness that underlie federal civil rights law. It communicates to other

female coaches that their authority is contingent, their leadership suspect, and their positions expendable.

62.     Coach Parney brings this action to remedy not only the harm done to her, but to challenge the institutional structures and attitudes that permitted it. Her case is not a challenge to student voice, nor an attempt to chill athlete expression. It is a demand that those voices be weighed responsibly and without bias, and that institutions be held to account when they allow prejudice, however subtle, to shape their employment decisions. Through this litigation, she seeks recognition, accountability, and the enforcement of the most basic workplace principle: that no one should lose their job for failing to conform to a stereotype.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of Title VII
### (Sex Discrimination and Hostile Work Environment)

47.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

48.     Plaintiff has satisfied all administrative prerequisites to suit under Title VII, including timely filing of a charge with the EEOC and receipt of a Notice of Right to Sue.

49.     Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to discriminate against an employee on the basis of sex. 42 U.S.C. § 2000e-2(a).

50.     At all relevant times, Defendant Alma College was an "employer" within the meaning of Title VII and was subject to its requirements.

51.     Defendant discriminated against Coach Parney on the basis of sex by treating her less favorably than similarly situated male coaches, subjecting her to heightened scrutiny, applying disparate evaluative standards, and ultimately terminating her employment based on gender stereotypes and perception bias.

15

52.     The adverse actions taken against Coach Parney were driven by sex-based assumptions about how female coaches should lead. She was held to a standard shaped by gendered expectations of warmth, deference, and emotional attunement, while male coaches employing comparable leadership styles were neither scrutinized nor penalized. Defendant's reliance on uncorroborated perceptions and generalized student discomfort reflects the operation of prescriptive and descriptive bias in violation of Title VII.

53.     Defendant failed to conduct a meaningful investigation into the concerns raised against Coach Parney. It accepted complaints without verification, withheld details of the allegations, and treated the existence of discomfort as a proxy for wrongdoing. This process lacked transparency, consistency, and objectivity, and permitted gender-based assumptions to substitute for fact-based analysis.

54.     Female coaches at Alma College, including Coach Parney, were required to navigate a system in which they bore additional burdens not imposed on male colleagues. These included managing athlete perceptions more carefully, adapting their communication styles to avoid gendered critique, and contending with higher rates of reporting based on gender socialization. These expectations constitute a form of systemic sex-based segregation in violation of Title VII.

55.     Defendant further misinterpreted increased reporting by female athletes (a predictable outcome of gender socialization) as evidence of coaching failure. This response, known in the literature as the "protection paradox," led to protective institutional action on behalf of athletes without regard to the validity or consistency of the underlying claims. At the same time, the content of those complaints was not subjected to meaningful scrutiny, creating a discriminatory feedback loop that uniquely disadvantaged Coach Parney.

56.     On information and belief, Defendant acted with reckless disregard for Coach Parney's rights under Title VII.

57.     As a direct and proximate result of Defendant's conduct, Coach Parney suffered loss of employment, wages, and benefits; damage to her reputation and career; emotional pain and suffering; and other compensable injuries.

58.     Coach Parney seeks all remedies available under Title VII, including reinstatement or front pay; compensatory and punitive damages; and equitable relief such as training, oversight of the athletic department, measures to ensure gender equity in employment practices at Alma College, and any other equitable relief deemed appropriate by the Court.

**SECOND CAUSE OF ACTION**
**Violation of Title IX**
**(Gender Discrimination and Hostile Work Environment)**

59.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

60.     At all relevant times, Defendant operated educational programs and activities that received federal financial assistance within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.

61.     Title IX prohibits sex discrimination in any education program or activity receiving federal financial assistance. This includes employment discrimination by federally funded educational institutions.

62.     Defendant violated Title IX by subjecting Coach Parney to discriminatory treatment on the basis of sex, including maintaining a segregated employment structure, requiring female coaches to bear additional interpersonal labor burdens not imposed on their

male counterparts, fostering a hostile work environment shaped by gender-based stereotypes, and terminating her based on those stereotypes and the gendered perceptions of athletes and other third parties.

63.     Defendant further violated Title IX by failing to conduct an impartial, thorough, or objective investigation into the concerns raised against Coach Parney. Rather than probing the influence of gender bias, Defendant ignored or avoided key evidentiary markers, including comparative analysis with male coaches, known gender-based reporting disparities, and the credibility of sources. By relying on uncorroborated student accounts and withholding investigatory findings, the College created a façade of procedural rigor while allowing gender stereotypes to shape the outcome.

64.     Defendant's investigatory failures were compounded by its disregard for well-established psychological mechanisms through which bias operates. These include stereotype confirmation bias, groupthink, and narrative distortion, all of which can magnify and reframe ordinary behavior as misconduct when filtered through gendered expectations. By refusing to implement investigative safeguards capable of filtering out these distortions, Defendant permitted discriminatory attitudes to dictate its employment decision.

65.     Defendant breached its duties under Title IX by failing to adopt or implement procedures that would have identified and mitigated the influence of sex-based stereotypes. These failures included accepting vague and subjective complaints without specificity, declining to seek verification from neutral observers, failing to assess the credibility of reporting sources, and ignoring clear investigative inconsistencies.

66.     As a direct and proximate result of Defendant's conduct, Coach Parney has suffered and continues to suffer damages including lost wages and benefits, reputational harm, career disruption, emotional distress, and related harms.

67.     Defendant acted with deliberate indifference to Coach Parney's rights under Title IX and, at times, with willful disregard for the foreseeable impact of its actions.

68.     Coach Parney seeks all available remedies under Title IX, including compensatory damages, equitable relief, attorney's fees and costs, and such other relief as the Court deems just and proper.

### THIRD CAUSE OF ACTION
### Violation of Title VII
### Illegal Segregation and Limitation on the Hiring and Retention of Women

69.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

70.     Title VII prohibits not only overt discrimination but also employment practices that result in the classification, segregation, or limitation of individuals on the basis of sex in a way that deprives them of employment opportunities or adversely affects their status. 42 U.S.C. § 2000e-2(a)(2).

71.     Defendant has engaged in unlawful occupational segregation by systematically excluding women from head coaching positions in men's sports while hiring and retaining men in head coaching roles in women's sports. This practice creates and reinforces sex-based limitations on employment opportunities and perpetuates a gendered hierarchy within the athletic department.

72.     As of the time of filing, Alma College has employed no women to coach men's teams, yet continues to hire and support men to coach women's teams. This pattern reflects a

discriminatory institutional structure that restricts women's advancement and perpetuates the stereotype that men are more qualified to lead, regardless of the gender of the athletes.

73.     Coach Parney was harmed by working within this segregated structure. The existence of sex-based job channeling perpetuated stereotypes that required her, and other female coaches, to manage emotional labor and navigate a narrow band of acceptable behavior. These constraints were not imposed on her male colleagues.

74.     Coach Parney has not applied for a position coaching a men's team. However, this fact is itself the result of the College's de facto segregation, which discourages female candidates from considering such roles and signals institutional disinterest in disrupting traditional gender lines.

75.     Even if Coach Parney is not eligible for direct damages related to exclusion from coaching men's teams, Alma College's pattern of sex-based segregation contributes to a broader discriminatory culture. It reinforces gender stereotypes among athletes, staff, and administrators, and creates an environment in which female coaches are treated as less authoritative and more expendable.

76.     Alma College's continued use of a segregated staffing model in its athletic programs is evidence of systemic discrimination, and supports the claims of unequal treatment raised in Counts I and II. It also reflects institutional knowledge of the risks that gender stereotyping poses, and the need for heightened diligence in responding to complaints against female coaches.

77.     Defendant's actions constitute a per se violation of Title VII's prohibition on sex-based classification and occupational limitation, and further support Plaintiff's claims under Title IX and, to the extent applicable, negligence theories set forth in Count IV.

78.     As a direct and proximate result of Defendant's conduct, Coach Parney has suffered and continues to suffer economic and non-economic harms, including lost earnings, reputational damage, and emotional distress.

79.     Defendant acted with deliberate indifference to Coach Parney's rights under federal law, and with willful disregard for the foreseeable harm caused by its policies and practices.

80.     Plaintiff seeks all available remedies under Title VII, including compensatory damages, injunctive relief to address unlawful segregation practices, and any other relief deemed just and proper by the Court.

## FOURTH CAUSE OF ACTION
### Violation of Title VII
### (Negligent Discrimination in Violation of Title VII)

81.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

82.     Title VII imposes an affirmative duty on employers to maintain a workplace free from sex-based discrimination, including obligations to prevent foreseeable harms arising from gender stereotyping and sex-based disparate treatment.

83.     Defendant had actual and constructive knowledge of the risks associated with gender bias in collegiate athletics. Its own training materials, policies, and practices reflect awareness of stereotype-based harms and the structural challenges faced by female coaches.

84.     Defendant had specific knowledge of the risks faced by Coach Parney, including repeated references to gender stereotypes in student commentary, evidence of differential treatment based on gendered expectations, and its own awareness of the limited representation of women in leadership roles.

85.     Defendant also participates in sex-based occupational segregation by failing to recruit, hire, or retain women to coach men's teams, while placing male coaches in leadership roles over women's teams. This structural inequality exacerbated the risks of stereotype-driven complaints and discipline.

86.     Defendant owed Coach Parney a duty of care to implement nondiscriminatory investigative and disciplinary procedures. This duty is particularly critical in the context of college athletics, where gender stereotypes are well-documented and carry predictable impacts on evaluation and discipline.

87.     Defendant breached that duty by conducting an investigatory process that appeared procedurally robust but was substantively deficient and biased. Despite supposedly investigating the matter, the College:

a. Failed to reach conclusions on the truth or falsity of specific allegations;

b. Treated unverified complaints as substantiated without corroboration or testing for accuracy;

c. Avoided examining the influence of gender bias, stereotype activation, or gendered perception discrepancies;

d. Withheld the investigatory report from Coach Parney and her counsel; and

e. Conflated emotional responses, hearsay, and stereotype-driven expectations with objective evidence.

88.     Defendant's negligence is further demonstrated by its failure to adopt standard investigative safeguards that would have reduced the impact of bias, including:

a. Requiring specificity regarding alleged conduct (dates, times, witnesses, statements);

b. Verifying allegations against available data sources such as practice schedules and third-party observers;

c. Comparing athlete perceptions of male and female coaches engaging in similar conduct;

d. Applying forensic techniques to distinguish credible recall from confabulation; and

e. Assessing the possibility of narrative contamination within athlete group dynamics.

90.     Defendant also failed to control for the "protection paradox," whereby gendered help-seeking behaviors by female athletes interact with institutional protective reflexes to yield unequal treatment of female coaches. Despite its own knowledge of gender-based reporting disparities, Defendant applied no safeguards to prevent this dynamic from skewing results.

91.     Defendant negligently failed to collect or analyze data that would have revealed the disparate impact of its disciplinary systems on women. This includes the failure to track differences in complaint frequency or intensity by athlete gender, or to assess whether comparable behavior by male coaches resulted in lesser consequences.

92.     These failures were not isolated lapses but reflected a systemic disregard for procedures that would have exposed gender bias. Defendant's pattern of procedural avoidance and overreliance on subjective, unverified complaints amounts to gross negligence and deliberate indifference to Coach Parney's rights under Title VII.

93.     The College's long-standing practice of gender-based coaching segregation further evidences its institutional awareness of the risks posed by stereotype-driven evaluations and its failure to take corrective action.

94.     As a direct and proximate result of Defendant's conduct, Coach Parney suffered economic loss, reputational damage, emotional distress, and related harms.

95.     Defendant acted with deliberate indifference and reckless disregard for Coach Parney's rights under federal law.

96.     Plaintiff seeks all available remedies under Title VII, including compensatory damages, equitable relief, and any other relief deemed appropriate by the Court.

## FIFTH CAUSE OF ACTION
## Disparate Impact Discrimination in Violation of Title VII

97.     Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

98.     Title VII prohibits not only intentional discrimination but also facially neutral employment policies and practices that have a disproportionate adverse effect on individuals based on sex, even in the absence of discriminatory intent. 42 U.S.C. § 2000e-2(k).

99.     Defendant Alma College has implemented and maintained facially neutral policies and practices that have a disparate impact on female coaches and, in particular, female coaches of women's teams. These include:

a. Complaint-Driven Evaluation Policy: Alma College evaluates coaches and initiates disciplinary proceedings largely based on the number and nature of athlete complaints, without requiring corroboration or neutral validation. Because female athletes report concerns at significantly higher rates than male athletes—due to well-documented gender-based socialization patterns—this policy results in female coaches being subjected to disproportionately greater scrutiny than similarly situated male coaches.

b. Flawed Investigative Procedures: Alma's investigative framework fails to require specific factual allegations, does not ensure corroboration through neutral witnesses, does not distinguish firsthand observation from inference, and does not account for the operation of gender stereotypes. These practices increase the risk that female coaches will

be adversely affected by stereotype-driven narratives more frequently than male counterparts.

c. <u>Reactive Intervention Without Contextual Training</u>: Alma College takes adverse employment action in response to student complaints without first providing education to athletes, investigators, or decisionmakers on gender-based reporting differences, stereotype activation, or the "protection paradox." This lack of institutional awareness amplifies the impact of gendered complaint patterns and disadvantages female coaches subject to those biases.

100.    The disparate impact of these policies is evidenced by available statistical data, including:

    a.  The complete exclusion of women from head coaching roles for men's teams at Alma College, and near-complete exclusion from assistant coaching positions for men's teams; and

    b.  The disproportionate rate at which female coaches of women's teams face adverse employment actions relative to male coaches who employ similar or more intense coaching methods.

101.    These disparities are not attributable to chance or neutral factors. Instead, they reflect the way Alma College's facially neutral practices interact with gender-based social dynamics—particularly differences in athlete reporting behaviors and stereotype confirmation bias—to produce consistent disadvantages for female coaches.

102.    Alma College's policies and practices that cause this disparate impact are not job-related for the coaching roles in question and are not consistent with business necessity. Even if

Defendant could demonstrate business necessity, less discriminatory alternatives are readily available and include:

    a. Implementing multi-method evaluation frameworks that incorporate performance metrics, coaching history, and neutral observations rather than relying primarily on student complaints;

    b. Adopting standardized investigative procedures that require specificity, corroboration, and comparator analysis;

    c. Providing training on gender socialization and stereotype awareness to students, investigators, and administrators; and

    d. Instituting equitable evaluation protocols that adjust for known differences in gendered reporting and emotional framing.

103. Defendant has failed to adopt any of these readily available alternatives, continuing instead to enforce policies that systematically disadvantage female coaches. This ongoing refusal to address the foreseeable disparate impact of its practices constitutes a violation of Title VII.

104. As a direct and proximate result of Defendant's enforcement of facially neutral policies that have an adverse impact on women, Plaintiff has suffered loss of employment, income, professional standing, and emotional well-being.

105. Plaintiff seeks all remedies available under Title VII for disparate impact discrimination, including injunctive relief, back pay, front pay, compensatory damages, attorneys' fees, costs, and any further equitable relief deemed appropriate by the Court.

### SIXTH CAUSE OF ACTION
### Pattern and Practice of Discrimination in Violation of Title VII

106. Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

107.     Title VII prohibits employers from engaging in a pattern or practice of discrimination such that discriminatory conduct becomes the standard operating procedure, rather than an isolated occurrence. *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977).

108.     Defendant Alma College has engaged in a pattern and practice of gender-based discrimination that extends beyond Coach Parney's individual experience and reflects systemic disparities in the hiring, evaluation, and retention of female coaches.

    a. The complete exclusion of women from head coaching positions for men's teams at Alma College, and the near-total exclusion from assistant coaching positions for those teams (only 2 out of 33 assistant coaching positions held by women);

    b. The application of fundamentally different evaluative standards to female coaches, as evidenced by the treatment of Coach Parney, who was terminated despite decades of success, based on athlete complaints that were neither verified nor contextualized, while male coaches who use comparable or more intense coaching methods remain employed without similar scrutiny;

    c. Consistent use of flawed investigative procedures that fail to screen for the operation of gender stereotypes, do not require specificity or corroboration, and disregard known gender-based differences in reporting behaviors; and

    d. Institutional disregard for predictable social science dynamics—such as the "protection paradox" and gender socialization—that place female coaches of female athletes under disproportionately close scrutiny and undermine fair evaluation.

109. These practices are not isolated errors or the product of individual decision-makers. Rather, they reflect a recurring, systemic approach that disadvantages women and perpetuates structural gender bias throughout the Alma College athletic department and administration.

110. The consistent exclusion of women from coaching men's teams, coupled with the differential standards applied to women coaching women's teams, constitutes strong evidence that gender-based discrimination is a routine, institutionalized component of Alma College's employment practices.

111. This pattern and practice of discrimination has resulted in the maintenance of a segregated and unequal coaching environment at Alma College, reinforcing stereotypes, discouraging female participation in leadership roles, and exposing women—particularly those coaching female athletes—to greater professional risk and harm.

112. As a direct and proximate result of Alma College's pattern and practice of gender-based discrimination, Plaintiff has suffered loss of employment, income, professional standing, and emotional harm.

113. Plaintiff seeks all available remedies under Title VII for pattern and practice discrimination, including injunctive relief to eliminate discriminatory practices, back pay, front pay, compensatory damages, attorneys' fees, and costs, as well as any other relief the Court deems proper.

**SEVENTH CAUSE OF ACTION**
**Violation of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 et seq.**
**(Gender Discrimination and Hostile Work Environment)**

114. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

115.    The Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 et seq., prohibits employers from discriminating against individuals on the basis of sex, including subjecting them to a hostile work environment or taking adverse employment actions based on sex.

116.    Defendant discriminated against Coach Parney on the basis of sex in violation of ELCRA by subjecting her to unequal treatment, fostering a hostile work environment shaped by gender stereotypes, and terminating her employment based on biased and unequally applied evaluative standards.

117.    Defendant's investigatory process further supports the inference of unlawful discrimination. Defendant did not corroborate material allegations, did not evaluate credibility, and avoided any inquiry into the potential role of gender bias or stereotype activation. These deliberate omissions rendered the process procedurally hollow and substantively discriminatory.

118.    Defendant contributed to the hostile environment by perpetuating unfounded allegations through linguistic and cognitive distortion, including relabeling routine coaching conduct as abusive or inappropriate when performed by Coach Parney, removing context from reported incidents, and allowing inference-based fabrications to shape the narrative without verification.

119.    As a direct and proximate result of Defendant's conduct, Coach Parney suffered and continues to suffer damages including loss of employment, income, career opportunities, and emotional distress.

120.    Plaintiff seeks all remedies available under ELCRA, including compensatory damages, equitable relief, attorney's fees and costs, and any other relief the Court deems appropriate.

## EIGHTH CAUSE OF ACTION
### Class Action Claims Under Title VII and Title IX

121.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

122.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, on behalf of herself and the following classes:

a.    All current and former female coaches employed by Alma College during the applicable statute of limitations period who have been subjected to discriminatory treatment, including stereotype-driven evaluations, unequal standards, and hostile work conditions based on gender (the "AC Class"); and current and former female coaches employed by Alma College within the applicable statute of limitations period who have been subjected to discrimination based on gender stereotypes, the protection paradox, and gender socialization effects (the "AC Class"); and

b.    All female coaches employed by public and private universities and colleges in Michigan within the applicable statute of limitations period who have been excluded from coaching men's teams or subjected to different standards when coaching women's teams due to gender segregation practices (the "Michigan Public University Class").

123.    The proposed classes satisfy the requirements of Federal Rule of Civil Procedure 23(a):

a.    *Numerosity*: Joinder of all members is impracticable. Based on available data, the AC Class includes approximately six current female head coaches and seventeen female assistant coaches, in addition to former coaches within the limitations period. The Michigan Public University Class includes approximately seventy-

five current female head coaches and 191 female assistant coaches at Michigan public universities, plus former coaches.

b.  *Commonality*: Common questions of law and fact include, but are not limited to:

    i.    Whether Defendants maintain policies or practices that result in gender-based segregation of coaching positions;

    ii.    Whether Defendants' evaluative or investigative procedures disproportionately harm female coaches;

    iii.    Whether Defendants' practices have a disparate impact on women under Title VII or Title IX;

    iv.    Whether female coaches are subject to different or higher standards than similarly situated male coaches;

    v.    Whether Defendants have engaged in a pattern or practice of gender-based discrimination; and

    vi.    Whether class members are entitled to injunctive, declaratory, or monetary relief.

c.  *Typicality*: Plaintiff's claims are typical of those of the class, as she has been subjected to the same discriminatory structures, policies, and practices that affect all members of the proposed classes.

d.  *Adequacy*: Plaintiff will fairly and adequately protect the interests of the class. She has retained experienced counsel with expertise in class action and employment discrimination litigation and has no interests that conflict with those of the class.

124.    The requirements of Rule 23(b)(2) are satisfied, as Defendants have acted and continue to act on grounds generally applicable to the classes, making declaratory and injunctive relief appropriate for the classes as a whole.

125.    The requirements of Rule 23(b)(3) are also satisfied. Questions of law and fact common to the classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

126.    Defendants' challenged policies and practices, such as gender segregation in coaching assignments, stereotype-influenced investigations and evaluations, and failure to apply neutral investigative standards, affect all class members in similar ways and present legal and factual issues that are common across the classes.

127.    Plaintiff seeks all remedies available under Title VII and Title IX on behalf of the classes, including:

    a.    Declaratory relief finding that Defendants' policies and practices violate federal law;

    b.    Injunctive relief requiring institutional reform of policies, procedures, and training related to coach evaluation, hiring, retention, and investigation;

    c.    Back pay and other compensatory relief for class members who experienced economic or reputational harm; and

    d.    Attorneys' fees and costs.

### NINTH CAUSE OF ACTION
### Request for Mandatory Injunctive Relief to Eliminate Gender Segregation in Coaching

128.    Plaintiff re-alleges the preceding paragraphs as if fully set forth herein.

129.     Defendant Alma College has engaged in and continues to engage in unlawful gender segregation within its athletic coaching staff, maintaining a system in which men are permitted to coach both men's and women's teams, while women are effectively excluded from coaching men's teams.

130.     This pattern constitutes illegal segregation in violation of Title VII, which prohibits employers from limiting, segregating, or classifying employees in any way that would deprive individuals of employment opportunities on the basis of sex. 42 U.S.C. § 2000e-2(a)(2).

131.     The current system imposes systemic burdens on female coaches, who are required to navigate additional pressures and perform additional emotional and identity-based labor due to pervasive gender stereotyping. No equivalent burdens are imposed on their male counterparts.

132.     The continued enforcement of this segregation constitutes an ongoing violation of federal and state anti-discrimination laws. The harm is active and continuing, and equitable relief is necessary to halt and remedy the practice.

133.     To satisfy the requirements for injunctive relief under Michigan law, Plaintiff must demonstrate: (1) irreparable harm; (2) a likelihood of success on the merits; (3) the absence of an adequate remedy at law; and (4) that the balance of hardships favors the party seeking the relief. *See generally Michigan State Employees Ass'n v. Dep't of Mental Health*, 421 Mich. 152, 157–58 (1984).

134.     Under federal law, a permanent injunction is appropriate where the plaintiff demonstrates: (1) irreparable injury; (2) inadequate remedies at law; (3) a balance of hardships favoring equitable relief; and (4) that the public interest supports the injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

135.    Plaintiff satisfies both standards:

a.  *Irreparable Harm*: Gender segregation in coaching causes lasting damage to female coaches by perpetuating exclusion, limiting advancement opportunities, and reinforcing harmful stereotypes. These harms are structural and cannot be adequately compensated through damages alone.

b.  *Likelihood of Success*: As detailed throughout this Complaint, Defendant's practices have created and perpetuated unlawful gender segregation and differential treatment. The statistical disparities, historical patterns, and unequal treatment of female coaches provide compelling evidence of likely success on the merits.

c.  *Inadequacy of Legal Remedies*: While monetary damages may compensate for some past harms, they cannot address future segregation or compel structural change. Injunctive relief is the only effective remedy to eliminate systemic barriers and prevent ongoing discrimination.

d.  *Balance of Hardships*: Plaintiff and other female coaches face significant harm from ongoing segregation. In contrast, Defendant would face only minimal inconvenience in adopting equitable hiring, evaluation, and promotion practices.

e.  *Public Interest*: The public has a strong interest in eradicating discriminatory practices from institutions receiving public funding. Promoting gender equity in coaching also serves educational objectives and strengthens the integrity of collegiate athletics.

136.    Accordingly, Plaintiff seeks a mandatory injunction requiring Alma College to adopt a comprehensive, evidence-based plan to dismantle its gender-segregated coaching structure and replace it with equitable, inclusive practices.

137.    This plan should include the following core components:

    a.  <u>Comprehensive Assessment and Accountability System:</u>

        i.  Conduct a full audit of coaching staff demographics and hiring patterns.

        ii.  Establish metrics and public benchmarks for progress.

        iii.  Implement annual public reporting requirements.

        iv.  Create enforcement mechanisms to ensure compliance.

    b.  <u>Formalized Entry Program Implementation:</u>

        i.  Establish fellowships or internships for women on men's teams.

        ii.  Require diversity goals in graduate assistant positions.

        iii.  Use blind first-round hiring processes.

    c.  <u>Career Development Infrastructure:</u>

        i.  Launch mentorship programs.

        ii.  Provide targeted leadership development.

        iii.  Offer certification, conference access, and cross-program learning.

    d.  <u>Hiring Practice Reform</u>:

        i.  Require diverse candidate pools and interview panels.

        ii.  Implement structured, bias-mitigated interview processes.

        iii.  Mandate interviews for qualified women applying to men's teams.

    e.  <u>Compensation and Retention Reforms</u>:

        i.  Conduct equity audits.

      ii.    Standardize contracts and salary transparency.

      iii.   Create family-supportive policies.

f.   <u>Culture Change and Visibility Initiatives:</u>

      i.    Promote and celebrate women in coaching roles.

      ii.    Educate athletes on gender bias and coaching diversity.

      iii.   Publicly affirm the College's commitment to gender equity.

g.   <u>Protection Paradox Mitigation:</u>

      i.    Use standardized rubrics.

      ii.    Distinguish perceptions from verified conduct.

      iii.   Require comparative analysis with male coaches.

h.   <u>Investigation Methodology Reforms:</u>

      i.    Require specificity and corroboration in complaints.

      ii.    Identify and discount stereotype-driven narratives.

      iii.   Train investigators on cognitive bias recognition.

      iv.   Developing protocols to distinguish between actual misconduct and gender-biased perceptions of normal coaching.

138.   The Court has authority under Title VII, 42 U.S.C. § 2000e-5(g), and Title IX to order such affirmative relief as necessary to remedy discriminatory practices.

139.   Michigan courts also possess broad equitable authority to grant similar relief under the Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 et seq.

140.   The relief sought is narrowly tailored, evidence-based, and reasonably achievable within the context of Defendant's resources and mission.

141.    Absent judicial intervention, gender segregation in coaching will persist, reinforcing outdated norms and imposing disproportionate burdens on female coaches at Alma College.

142.    Granting this relief would not only address Plaintiff's injury but would position Alma College as a national leader in promoting equity in collegiate athletics.

143.    Plaintiff respectfully requests that this Court retain jurisdiction to monitor the implementation of injunctive relief and make any modifications necessary to ensure compliance and efficacy in eliminating gender segregation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Kate Parney requests judgment against Defendant in an amount which will fully and fairly compensate her for her injuries and damages; reinstatement; lost wages and benefits; compensatory damages for loss of employment; emotional pain and suffering; indignity; humiliation; embarrassment; inconvenience; damage to her reputation; loss of career; out-of-pocket expenses; punitive damages; equitable relief; and any other relief the Court deems just and necessary to make Plaintiff whole and effectuate the purposes of Title VII and Title IX; prejudgment and post-judgment interest as allowed by law; attorneys' fees; expert witness fees; and costs.

The actions of Defendant also require the imposition of specific equitable and injunctive relief necessary to enforce the mandates of Title VII and Title IX including, but not limited to:

      a.   Ordering Alma College to reinstate Kate Parney to her position as head coach of the women's soccer team;

b.  A mandatory injunction that requires Defendant to begin recruiting and hiring women to coach men in assistant and head coaching positions;

c.  Training on the removal of implicit bias and gender stereotypes from the assessment of female students and female coaches;

d.  Training on gender-based reporting differences and the protection paradox that creates inequitable evaluation systems for coaches of women's teams;

e.  Implementation of multi-method assessment approaches that account for gender differences in help-seeking and reporting behaviors;

f.  Implementing investigation methodology reforms that require incident specificity, factual verification, and comparative analysis for all coaching complaints;

g.  A public statement that clears Kate Parney from any suggestion that she engaged in any violation of policy or coaching standards.

h.  Such other and further relief as needed to make Kate Parney whole.


Respectfully submitted,

Attorneys for Plaintiff

**ROUMEL LAW**

*/s/ Nicholas Roumel*

4101 Thornoaks Dr.
Ann Arbor MI 48104
(734) 645-7507
*nick@roumel-law.com*

*Pro Hac Vice Forthcoming*

**Newkirk Zwagerman, P.L.C.**

*/s/ Thomas Newkirk*
Thomas Newkirk
IA Bar No.  AT0005791
tnewkirk@newkirklaw.com

Myles D. Young AT0015901
myoung@newkirklaw.com

3900 Ingersoll Ave, Suite 201
Des Moines, IA  50312
Tel: (515) 883-2000
Fax: (515) 883-2000